829 A.2d 589

Elise (Foley) ROPER

v.

Suzanne CAMUSO.

No. 100, Sept. Term, 2002.

Court of Appeals of Maryland.

July 30, 2003.

242

Barbara R. Graham, Rockville, for petitioner.

Anthony M. Shore, Rockville, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, JJ.

I.

HARRELL, J.

The W.C. and A.N. Miller Development Company ("Miller") developed Spring Meadows, a residential subdivision near Darnestown, in western Montgomery County. Miller created covenants at the inception of the Spring Meadows development in order to maintain open space concepts and views from within the development to the surrounding rolling hills. These covenants were recorded concurrently in the land records of Montgomery County with the conveyance by Miller arguably of all the lots in the development, with the exception of a lot conveyed to Elise Roper, Petitioner. The covenants provide, in part:

1.(d) No line fence or wall, or fence or wall used for the purpose of dividing or enclosing a lot, in whole or in part, shall be placed, erected or permitted to remain on any lot, or any portion thereof, except hedge, shrubbery, stone, brick, ornamental iron, mortised post and split rail, or plank, which does not exceed four (4) feet in height, except with the written consent of the [Architectural Control] Committee . . .

6. The Grantor [Miller] expressly reserves to itself, its successors and assigns, the Architectural Control Committee and each Grantee of a lot within Spring Meadows which is subject to these covenants, conditions and restrictions and its and their heirs, successors and assigns, the right to enforce the covenants, conditions and restrictions herein contained and to take such legal or other action as may be required attempting to violate any of these covenants, conditions or restrictions.

On 25 August 1988, Suzanne Camuso ("Respondent") and her husband purchased from Miller lot 35 in Block D of Spring Meadows. Their deed provided that it was "subject to covenants and restrictions of record." A copy of the covenants was recorded concurrently with their deed. Four years later, Miller conveyed Lot 36 of Block D, adjoining the Camusos' lot, to Elise Foley (now Elise Roper) ("Petitioner"). Although

Foley's deed provided that the conveyance was "[s]ubject to covenants and restrictions of record," no covenants or restrictions were recorded concurrently with the Miller—to—Foley deed.

Later, in 1992, Ms. Roper built a fence on her lot along the common boundary with the Camusos' lot. That fence allegedly exceeded the height restrictions imposed by the covenant. By letter dated 5 October 1992 to Ms. Roper, Allison N. Miller, III, in his capacity as Vice President of the Spring Meadows Architectural Control Committee,[1] noted that a "resident" in the Spring Meadows community had inquired about a "picket stockade fence" and a "drive way post lamp lighting" installed on Ms. Roper's property. He enclosed a copy of the covenants with the letter and noted concern that the structures violated the covenants. Ms. Roper did not take any action to remove the structures or otherwise bring them into conformity with the covenants. By letter dated 1 July 1993 to Ms. Roper, Edward J. Miller,[2] in his capacity as President of the Architectural Control Committee, referred to the 5 October 1992 letter and noted that "several property owners in the Community" had voiced concerns about the type of fence installed. Ms. Roper did not remove or otherwise alter the structures in response to this letter either.

In 1997, Ms. Camuso planted a row of approximately sixty-five Leyland Cypress trees on her lot along the Camuso/Foley common boundary. According to Ms. Roper, by the summer of 2000, the trees had grown to a height of more than eight feet and branches had grown over the fence on her property and into the vertical space above her property. Without consent, Ms. Roper and her husband pruned some of the

---

1. Although not fully fleshed out in the covenants as to its composition and other organizational and operating features, the Architectural Review Committee was charged in the covenants with oversight and enforcement responsibilities regarding the covenants.

2. Allison N. Miller, III, and Edward J. Miller were affiliated with Miller, the developer.

branches, including some branches on the Camusos's side of the boundary.

On 30 August 2000, Ms. Camuso filed, in the District Court of Maryland, sitting in Montgomery County, a trespass and destruction of property action against Ms. Roper for cutting the trees. The case was removed to the Circuit Court for Montgomery County on a jury trial request. Ms. Roper also filed a counter-claim, seeking damages for malicious prosecution (Count I), a declaration that the trees violated the Spring Meadows covenants (Count II), and injunctive relief requiring Ms. Camuso to comply with the covenants as to the trees (also in Count II).

Approximately a year after suit was filed, trial was held. The trespass and malicious prosecution claims were tried to a jury. Allison N. Miller, III, the vice president of Miller, in addition to his Architectural Review Committee position, testified as a witness for Ms. Roper. He explained that the covenants applied to every lot in Spring Meadows, but that Ms. Roper's lot was the only one he knew of that expressly was not subject to the covenants. He further testified that it was his understanding that only grantees who had covenants recorded on their properties were entitled to enforce the covenants:

Q: Who may enforce the covenants?

A: The company, the grantor or the grantees.

Q: In laymen's terms, that would be—

A: The Miller Companies and/or the residents.

Q: By resident, would that be a homeowner?

A: It would be a grantee which would be a property owner who has had the covenants recorded on their property.

At the conclusion of the jury trial phase, the jury found in favor of Ms. Camuso on her trespass claim and awarded damages. The jury also found against Ms. Roper as to her malicious prosecution claim.

As to Ms. Roper's claims for declaratory and injunctive relief, the trial judge, in an effort to avoid time-consuming

duplication, considered the same evidence introduced before the jury. Neither party objected to this. He also heard additional testimony and heard additional argument from counsel. He found that Ms. Roper failed to prove by a preponderance of the evidence that she had standing to enforce the covenants and dismissed her declaratory and injunctive claims on that basis.[3]

---

3. The trial court's oral ruling was as follows:

Okay, thank you counsel. Here is the way I see it. What is before me at the moment is the counter-plaintiff, Mrs. Roper's complaint Count II, which asks for a declaratory judgment.

In order for the Court to issue a declaratory judgment as requested, Ms. Roper would have to have standing to bring the claim or to enforce the covenants.

The burden of proof is on her to prove by a preponderance of the evidence that she has standing. The status of the evidence is such that I find that she has not done that.

As a matter of fact, it is more likely so than not so that the covenants do not apply to her property, to her and her husband's property.

So therefore, she doesn't have standing. I don't think I can correct the absence of standing by assuming some type of equitable powers to do for the parties that which they didn't do for themselves.

I don't think equity extends that far and I think it is a legal question, not an equitable question. The legal question is does she have standing. If she does, then we can go further. If she doesn't, we cannot go any further.

In my view, she has no standing to enforce the covenants. So therefore, I will dismiss Count II of the counterclaim for declaratory judgment. . . .

Although the judge referred to the request for declaratory relief in his oral ruling, it is manifest from the docket entry ("Dismisses Count # 2 of the counterclaim") and implicit in his oral ruling that he intended to dispose of both aspects of Ms. Roper's claims in Count II. Although we shall conclude that the substantive conclusion reached by the trial court was erroneous, the procedural aspect of the trial court's disposition of Count II of Roper's complaint had the court been correct as a matter of law in its substantive reasoning, would have been proper.

This Court has declared that dismissal is "rarely appropriate in a declaratory judgment action," *Christ v. Dep't of Natural Res.*, 335 Md. 427, 435, 644 A.2d 34, 37 (1994) (quoting *Popham v. State Farm*, 333 Md. 136, 140 n. 2, 634 A.2d 28, 30 n. 2 (1993)), and that when a declaratory judgment action is brought, the trial court must render a declaration of the rights of the parties even if the party requesting declaratory judgment is ultimately unavailing at trial. *Harford Mutual v. Woodfin*, 344 Md. 399, 414–15, 687 A.2d 652, 659 (1997). There are, however, a few exceptions to this principle. We have recognized an

Petitioner appealed. The Court of Special Appeals, in an unreported opinion, affirmed the judgment of the Circuit Court. Petitioner then filed a petition for certiorari, which we granted. 372 Md. 429, 813 A.2d 257 (2002).

## II.

We granted certiorari to consider the following issues:

I.   May a property owner whose land is not expressly subject to restrictive covenants apply the doctrine of implied negative reciprocal covenants to enforce restrictive covenants against a property owner whose land is expressly subject to those covenants?

II.   What evidence is sufficient to demonstrate that land not expressly subject to restrictive covenants was intended to be subject to restrictive covenants?

We conclude that the Court of Special Appeals and Circuit Court erred and, therefore, reverse the judgment of the Court of Special Appeals and remand this matter to that court with directions that it reverse the Circuit Court and remand the case for further proceedings not inconsistent with this opinion.

## III.

Ms. Roper argued to the intermediate appellate court that the trial court erred in finding that she did not have standing to enforce the covenants. She conceded that her property was not burdened expressly by the covenants because they were not recorded with her deed and, therefore, a presumption arose that the restrictions did not apply to her lot. Ms. Roper

---

exception where the plaintiff lacks standing. *See State v. Burning Tree Club,* 301 Md. 9, 18, 481 A.2d 785, 789 (1984). It is proper to dismiss an action for declaratory judgment when the party seeking such judgment has no standing and there is no justiciable controversy properly before the court. *See Broadwater v. State,* 303 Md. 461, 467, 494 A.2d 934, 937 (1985) (noting the propriety of dismissing a request for declaratory relief when there is no justiciable controversy); *Hamilton v. McAuliffe,* 277 Md. 336, 340, 353 A.2d 634, 637 (1976) (noting that justiciability is a prerequisite to disposition of a request for declaratory relief).

asked the Court of Special Appeals to conclude nonetheless that her lot was burdened by the covenants under the doctrine of implied negative reciprocal covenants. Under that doctrine, her lot would be burdened by the covenants and thereby bestow upon her the corresponding right to benefit from and enforce the covenants to the same extent as enjoyed by the property owners in the development whose lots were burdened expressly by the covenants.

Ms. Camuso contended in the intermediate appellate court that Ms. Roper's arguments demonstrated a misunderstanding of the appropriate standard of review governing the appeal and that the clearly erroneous standard does not apply because the relevant issues raised on appeal were tried by the judge, not the jury. Ms. Camuso reasoned that, to enforce such a restriction in equity, one must have standing entitling him or her to seek equitable relief and that the trial judge's finding that Ms. Roper did not have standing was supported by a preponderance of the evidence. Ms. Camuso averred that the intent of the parties controlled the court's interpretation of the covenants and that the only intent that could be inferred from the deeds and covenants was that the Spring Meadows covenants govern Ms. Camuso's lot, but did not apply to Ms. Roper's lot. Respondent argued that that intent was revealed by the documentary evidence and Mr. Miller's testimony that the Roper lot was not intended to be burdened by the covenants.

The Court of Special Appeals found that the trial judge did not abuse its discretion in finding that Ms. Roper lacked standing to enforce the covenants against Ms. Camuso. Because Ms. Roper conceded that the covenants were not recorded with her deed, triggering the presumption that the restrictions do not apply to her lot, the only contention the intermediate appellate court considered on direct appeal was whether Ms. Roper's lot was subject to the covenants under the doctrine of implied negative reciprocal covenants.

The court described the doctrine by referring to what this Court stated in *Schovee v. Mikolasko,* 356 Md. 93, 737 A.2d 578 (1999):

The doctrine of implied negative reciprocal covenants recognizes, at least under certain circumstances, that when a common grantor develops land for sale in lots, pursues a course of conduct indicating an intention to follow a general plan or scheme of development with respect to the land, and imposes substantially uniform restrictions on the lots conveyed, those same restrictions may be enforced against the land retained by the common grantor if that land is found to be part of the general plan of development and the buyers purchased their lots with that understanding.

(quoting *Schovee*, 356 Md. at 99–100, 737 A.2d at 582). The intermediate appellate court observed that such cases typically are initiated by a plaintiff who owns a lot in a subdivision that expressly is subject to covenants and asks a court to exercise its equitable powers to impose the covenants upon a lot within the subdivision that has not been subjected expressly to the covenants. The defendant in the typical case is usually the developer or common grantor who retained title to an unrestricted lot or parcel. Ms. Roper, however, presents an unconventional circumstance because she seeks to subject her property to the covenants so that she may have standing to enforce them against another grantee who clearly is subject to the covenants. The court essentially concluded that the doctrine of implied negative reciprocal covenants was inapplicable to Ms. Roper's case because there are no Maryland cases with similar factual circumstances.

The Court of Special Appeals further found that Ms. Roper would not be entitled to relief even if the doctrine was applicable to her "reverse" factual circumstances. The court enumerated the elements a party must show in order for a court to enforce covenants against a party not expressly subject to the covenants:

(1) a common owner subdivided property into a number of lots for sale, (2) the common owner had an intention to create a general scheme of development for the property as a whole, in which use of the land was unrestricted, (3) the vast majority of subdivided lots contain restrictive covenants that reflect the general scheme, (4) the property against

which application of an implied covenant is sought was intended to be part of the general scheme of development, and (5) the purchaser of the lot in question had notice, actual or constructive, of the condition.

(quoting *Schovee*, 356 Md. at 103, 737 A.2d at 583–84). The court purported to apply these factors to the factual record of the present case and opined that a reasonable fact-finder could find or infer the following:

that [Miller] did subdivide a farm property into a number of building lots for sale; that [Miller] did intend to create a general scheme of development of the property as a whole; that all but one (appellant's) of the lots were expressly subject to the general scheme created by the covenants; and that appellant purchased her lot with an understanding that it would be subject to the covenants as well.

The court further found "[w]hat a rational trier of fact could not reasonably infer, however, is that appellant's lot was intended to be a part of the general scheme." The Court of Special Appeals commented that the record was "devoid of an explanation of why her lot was not similarly burdened" and found that Ms. Roper "has failed in meeting her burden of rebutting the presumption that her lot was not intended to be burdened." Thus, the court concluded that Ms. Roper did not have standing and affirmed the judgment of the Circuit Court of Montgomery County.

## IV.

### A.

Ms. Roper posits to this Court that a property owner whose land is not subject expressly to restrictive covenants nonetheless may enforce, under the doctrine of implied negative reciprocal covenants, restrictive covenants against a property owner whose land is subject expressly to those covenants. She further contends that she presented sufficient evidence to demonstrate that her property was intended to be subject to Spring Meadows' restrictive covenants and that the developer's more contemporary testimony at trial in this matter

should not be determinative of what the developer's intent was at the time of conveyance and recordation.

Petitioner suggests that the doctrine of implied negative reciprocal covenants exists "to provide a measure of protection for those who bought lots in what they reasonably expected was a general development in which all of the lots would be equally burdened and benefitted." *Schovee*, 356 Md. at 107, 737 A.2d at 586. Although the "typical" case arises when a developer fails to include restrictions in one or more subsequent deeds and those buyers proceed to use their property in a manner not allowed by the restrictions, 356 Md. at 108, 737 A.2d at 586, Ms. Roper contends that the doctrine nonetheless applies to her situation.

Although Petitioner, in her brief, walks us through application of the five factors outlined in *Schovee*, we need focus only on the fourth factor (lot sought to be subjected to the restriction was intended to be part of the general scheme) as it is the main object of Ms. Camuso's challenge to the attempted application of the doctrine. Satisfaction of the first element, that a common owner subdivided a property into a number of lots for sale; the second element, grantor's intent to create a general scheme to restrict all of the land in a subdivision; the third element, that the vast majority of subdivided lots be burdened by the covenants reflecting the general scheme; and, the fifth element, notice of the covenants, is not challenged seriously.

The fourth factor composing the doctrine of implied negative reciprocal easement is that the property against which application of an implied covenant is sought was intended to be part of the general scheme of development. Ms. Roper naturally asserts that her lot was intended as part of Spring Meadows' general scheme of development. She suggests that the fact that the Spring Meadows covenants were not recorded with her deed presents "opposing implications"—an implied intent that the grantor intended to include all of the land in the development to the same restrictions versus an implied intent that land not burdened expressly not be subject to the

development's restrictions. Therefore, she urges consideration of extrinsic evidence to determine whether her lot was intended to be part of the general scheme.

Ms. Roper enumerates the following facts supporting an intent to subject her property to the covenants:

—Petitioner's Deed contained the phrase, "Subject to covenants and restrictions of record."

—The developer, Miller, gave Petitioner a copy of the Spring Meadows covenants at closing.

—Miller designed Spring Meadows as a residential community of open spaces with panoramic views.

—Miller also planned Spring Meadows as an equestrian community with bridle paths, i.e., easements running along the rear of many lots, including Petitioner's.

—The Architectural Review Committee, in letters dated 5 October 1992 and 1 July 1993, expressed the intent that Petitioner's property conform to the Spring Meadows covenants.

—Mr. Miller expressed his opinion that Petitioner's property was subject to the Covenants.

—Petitioner believed her property was subject to the Covenants.

Petitioner contends that after she purchased her home, she was treated by the Architectural Control Committee, controlled by the developer, as if her property was subject to the Covenants. In a letter dated 5 October 1992 and in a follow-up letter dated 1 July 1993, the Committee questioned whether Petitioner's fence conformed to the Spring Meadows covenants. The 5 October 1992 letter read as follows:

October 5, 1992

Ms. Elise Foley

14801   Spring Meadows Drive

Darnestown, MD 20874

Dear Ms. Foley:

We are in receipt of an inquiry from a resident of Spring Meadows relating to a "picket stockade fence" and "drive-

way post lamp lighting" being installed at your house. The inquiry questions the conformity of Spring Meadows Covenants of said fence and post lamps. I have enclosed a copy of the covenants which specify allowable building guidelines and requests for approval. We would be happy to review any plans you have for this work and approve if in conformity with the applicable covenants.

We bring this to your attention given the enforceability section of the Covenants. Please call if you have any questions.

Sincerely,

Allison N. Miller, III

Vice President

Architectural Control Committee

Enclosure

The follow-up letter provided:

July 1, 1993

Ms. Elise Foley

14801   Spring Meadows Drive

Darnestown, MD 20874

Dear Ms. Foley:

On October 5, 1992, we sent you a letter regarding a "picket stockade fence" and "driveway post lamp" installed on your property at the above noted address. This letter was prompted by concerns voiced by several property owners in the Community about the conformity of the type of fence installed with the restrictive covenants that specifically state the allowable fence types that may be installed. I bring this to your attention at the request of those concerned property owners.

Should you have any questions relating to this matter, please do not hesitate to call.

Sincerely,

Edward J. Miller, Jr.

President

Architectural Control Committee

Ms. Roper draws attention to the language, "several property owners," in the 1 July 1993 letter, as evidence that her neighbors, Miller, and Respondent, considered Ms. Roper's property to be burdened by the covenants.

Petitioner dismisses the failure to record the covenants with the deed to her lot by referring to a quotation from *Turner v. Brocato*, 206 Md. 336, 111 A.2d 855 (1955): "That several lots were conveyed without restrictions does not of itself negative an intent that there should be a general comprehensive plan, nor is it fatal to a finding that there was such a plan." 206 Md. at 352, 111 A.2d at 864. Ms. Roper's argument continues that the community plan for open spaces and panoramic views would be defeated if she, and she alone, could erect tall fences on her property to obstruct the views of her neighbors; subdivide her lot and build additional homes on less than two acres of land;[4] and erect and rent out signs and billboards on her property in contravention of the covenants.[5] Ms. Roper concludes that to "ensure the integrity of the Spring Meadows plan of development," her property must be subject to the covenants.

Ms. Roper's second bundle of assertions center around her contention that she presented ample evidence from her deed and extrinsic to her deed to prove that her lot was intended to be burdened by the covenants.[6] Ms. Roper insists that if her

4. Spring Meadows Covenant 1.(k) provides that "No lot shall be subdivided in any manner or sold in any manner other than the whole, except with the written consent of the Committee."

5. Spring Meadows Covenant 2.(a) provides that "No advertising sign, billboard or other similar device shall be placed, erected or permitted to remain on any lot."

6. Ms. Roper cites to several cases where Maryland courts considered a variety of extrinsic evidence to determine the intent of a general scheme or plan. *See Club Manor, Inc. v. Oheb Shalom Congregation of Baltimore City*, 211 Md. 465, 128 A.2d 405 (1957) (considering expressions of who was intended to benefit from the restrictions on land as inferred from the language in the conveyance, the nature of the development, and the purpose of the restriction); *Turner*, 206 Md. 336, 111 A.2d 855

deed itself is not sufficient evidence to show that her lot was intended to be part of a general scheme or plan of development and subject to its covenants, extrinsic evidence must be considered. For example, all of the deeds to lots in Spring Meadows, including hers, referred to the Spring Meadows covenants. The letters from the Architectural Review Committee to Roper indicate that several property owners in Spring Meadows understood Ms. Roper's property to be part of the general scheme, subject to the covenants, and enforceable for the benefit of all property owners in the development. Miller gave Ms. Roper a copy of the covenants at her settlement, indicating again the intent that Ms. Roper's lot be subject to the covenants. Ms. Roper concludes that the evidence favors the inference that her lot was intended to be burdened by the covenants and she therefore has standing to enforce them.

Petitioner's final contention is that the contemporary testimony of Allison N. Miller, III, at trial should not be considered as determinative of the developer's intent at the time of conveyance. Although this Court has not made any definite pronouncement on the matter, we stated in *Adams v. Parater,* 206 Md. 224, 230, 111 A.2d 590, 592 (1955), in holding that evidence outside a deed could be considered in deciding issues involving restrictive covenants,

An inference which appears with sufficient clearness from any source should be accepted. To this one reservation should be made, however. *It may be questioned whether present testimony by one of the developers as to his meaning and purpose in inserting the covenant in the conveyances is receivable in evidence to support or defeat the contentions of purchasers of lots* [ ] (Emphasis added),

(finding as evidence of intent language and conduct giving purchasers notice of restrictions which would lead purchasers to believe that all of the land was burdened with the same restrictions); *Bright v. Lake Linganore Ass'n, Inc.,* 104 Md.App. 394, 656 A.2d 377 (1995) (finding notice to purchasers of restrictive covenants was sufficient evidence of the intent for the covenants to burden the lots at issue).

Ms. Roper further asserts that "it is not always the purpose in the grantor's mind that must be carried out. From expressions used, [and] inducements extended[,] the law determines rights and obligations and *not from subsequently disclosed mental operations to the contrary.*" *Turner,* 206 Md. at 352, 111 A.2d at 863 (emphasis added). She contends that the purposes of the covenants would not be furthered by focusing on the developer's present expression without considering all other relevant evidence and the inferences to be drawn from that evidence.

## B.

Ms. Camuso asserts that the appropriate standard of review for this Court is found in Maryland Rule 8–131(c) which provides for review of the trial court's judgment on both the law and the evidence.[7] Under this standard, the trial court's judgment may not be set aside unless the trial court made an error of law or if its judgment on the evidence was clearly erroneous. Ms. Camuso urges that the trial court did not make any errors of law and that the trial court's factual findings were supported by a preponderance of the evidence.

Ms. Camuso contends that the judgment of the trial court should be affirmed because both the Court of Special Appeals and the trial court properly found that, even if the doctrine of negative reciprocal covenants were available to her, Ms. Roper failed to prove that she had standing to enforce the covenants.[8] Ms. Camuso does not argue that Spring Meadows was

---

7. Maryland Rule 8–131(c) (Action tried without a jury) provides:

   When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

8. Although Ms. Camuso, in her brief, mounted a challenge that proclaimed that the doctrine of implied negative reciprocal covenants may be asserted only against a common grantor who has retained land, and may not be asserted by a grantee who is not burdened expressly by the covenants against another grantee who is so burdened, she abandoned such a contention in her oral argument before the Court.

not intended to be developed according to a common plan, but that Ms. Roper's lot was not intended to be part of that plan. Ms. Camuso reiterates the intermediate appellate court's reasoning that there existed an initial presumption that the covenants did not apply to her lot and Ms. Roper failed to present evidence sufficient to rebut this presumption.

Respondent claims that the evidence shows that Ms. Roper failed to demonstrate that the common grantor intended her land to be burdened by the covenants as part of a uniform scheme of development. The evidence showing that Miller apparently recorded the Spring Meadows covenants concurrently with the rest of the deeds in the community, but not with Ms. Roper's deed, is itself conclusive evidence that Ms. Roper's lot was not intended to be burdened by the covenants, according to Respondent. She relies on *Schovee* to conclude that the use of recorded declarations normally would be conclusive as to whether a parcel was burdened by a covenant. 356 Md. at 113, 737 A.2d at 589.

Although noting an exception recognized by this Court permitting application of the doctrine in cases where the developer "acted inconsistently with its exclusion [of a particular lot from the recorded covenants] and, through its conduct, afforded a basis to apply the doctrine," 356 Md. at 103, 737 A.2d at 584, Ms. Camuso claims that the record in this matter is devoid of any evidence of such conduct. She suggests that the mere fact that Ms. Roper received a copy of the covenants with her deed simply indicates that the developer wanted her to be aware of them and was not an assertion that her lot was intended to be burdened. Ms. Camuso further argues that Maryland law requires that covenants be construed based on the intent of the parties as expressed in the written instrument. The only intention of the parties that may be inferred from the deeds and covenants at issue in this case, according to Ms. Camuso, is that the Spring Meadows covenants govern Ms. Camuso's lot, but do not apply to Ms. Roper's lot.

The documentary evidence pointed to by Ms. Camuso in support of her contentions is corroborated, in her view, by the

testimony of Allison N. Miller, III: only grantees who had the covenants recorded as to their property were entitled to enforce the covenants. Analyzing the evidence in the light most favorable to her, Respondent argues it would be impossible to reach any conclusion other than that the covenants do not apply to Ms. Roper's lot and she therefore does not have standing to enforce them.

Ms. Camuso continues by disputing the persuasiveness of the evidence proffered by Ms. Roper to support the contention that there was an intent to subject her lot to the covenants. First, she argues that the fact that Ms. Roper's deed references the covenants is irrelevant as the covenants themselves were not recorded with the deed to her lot. Second, she suggests that the copy of the covenants conveyed to Ms. Roper reflected an intent to inform her of the restrictions imposed on the other members of the community, but not impose them upon her. Third, the community plan for open spaces with panoramic views is also unavailing, according to Ms. Camuso, and does not imply that Ms. Roper's lot was burdened by the covenants. Fourth, the letters from the developer, in the name of the Architectural Review Committee and sent to Ms. Roper in 1992 and 1993, suggest that the developer wanted her to comply with the covenants, but did not imply that she was legally bound to do so. That the developer never filed a legal action against Ms. Roper undercuts Petitioner's argument that the developer believed she was bound by the covenants. Ms. Camuso notes Mr. Miller's testimony that he did not know whether Ms. Roper was subject to the covenants. She contends that Ms. Roper's argument that his testimony should not be relied on to defeat her contentions as a lot purchaser, under *Adams v. Parater*, 206 Md. 224, 111 A.2d 590, is not preserved for appellate review because she did not object to his testimony at trial.

Penultimately, Ms. Camuso argues that Ms. Roper's claim for equitable relief is barred by the doctrine of unclean hands, her failure to do equity, and the doctrine of comparative hardship. Respondent claims that under Maryland law

[t]he maxim that "he who comes into equity must come with clean hands" closes the doors of a court of equity to any person who has violated any of the fundamental principles of equity relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. The doctrine is rooted in the historical concept of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. While equity does not demand that its suitors shall have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.... Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the application of the maxim by the chancellor.

*Thomas v. Klemm,* 185 Md. 136, 142, 43 A.2d 193, 197 (1945). In this case, Ms. Camuso argues that Ms. Roper does not have clean hands because she trespassed on Ms. Camuso's lot numerous times and destroyed branches on her trees. Ms. Camuso also alleges that Ms. Roper continuously violated the same covenants she charges Ms. Camuso with violating since 1992. Maryland law also requires "she who seeks equity must do equity" and there is no evidence in the record that Ms. Roper is prepared to remove or reduce the height of her fence to make it comply with the Spring Meadows covenants. *See Funger v. Mayor and Council of Somerset,* 244 Md. 141, 151–52, 223 A.2d 168, 174 (1966).

Ms. Camuso finally contends that we should affirm the judgment under the doctrine of comparative hardship which provides that a court may decline to issue an injunction where the hardship and inconvenience which would result from the injunction is greatly disproportionate to the harm to be remedied. *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.,* 361 Md. 371, 396–97, 761 A.2d 899, 912 (2000). The relief requested by Petitioner would require Ms. Camuso to destroy sixty-five Leyland Cypress trees and entail a significant expense. Denying the relief would simply mean that Ms. Roper's view on one side of her property is obscured by the trees. Thus,

granting the injunctive relief sought by Ms. Roper would impose a far greater. hardship on Ms. Camuso than denying that relief would impose on Ms. Roper.

## V.

### A.

■ The issues before this Court arise from the trial judge's disposition of Ms. Roper's request for declaratory and injunctive relief. The standard of review of an action tried without a jury is clear. Rule 8–131(c) provides that the judgment of the trial court is not to be set aside unless it is clearly erroneous. *See supra* n. 7. We expressed the appropriate standard of review of dispositions of injunctive relief requests in *Urban Site Venture II Ltd. P'ship v. Levering Assoc. Ltd. P'ship,* 340 Md. 223, 665 A.2d 1062 (1995):

> Both this Court and the Court of Special Appeals, when reviewing a case tried without a jury, must "review the case on both the law and the evidence." Maryland Rule 8–131(c).... [W]e must consider the evidence in the light most favorable to the prevailing party, and decide not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence.

340 Md. at 229–30, 665 A.2d at 1065 (internal citations omitted). Trial courts are granted broad discretionary authority to issue equitable relief. *State Comm'n on Human Relations v. Talbot Co.,* 370 Md. 115, 127, 803 A.2d 527, 534 (2002). We stated in *Colandrea* that because "[t]he trial court ordinarily has the discretion to grant or deny a request for injunctive relief in general equity matters ... that decision is reviewed by this Court under an 'abuse of discretion' standard." 361 Md. at 394, 761 A.2d at 911.

### B.

■ The doctrine of implied negative reciprocal covenants developed in order to provide protection for purchasers buying lots in what they reasonably expected was a general

development in which all of the lots would be equally burdened and benefitted. Our decisions in *Schovee* and *Turner* provide the substantive history of the development of this doctrine in Maryland law. The seminal prerequisite for asserting that an implied negative reciprocal covenant exists is a common grantor who has a general plan of development for the land. If a general plan of development exists establishing certain restrictions on property use, those restrictions could be enforced in equity. *Adams,* 206 Md. at 229–30, 111 A.2d at 592. We stated in *Turner* that "[t]he jurisdiction of equity to enforce certain rights in respect of land is not necessarily dependant upon technicalities which are so important at law." 206 Md. at 345–46, 111 A.2d at 860. A court's primary interest in equity is to give effect to the actual intent of the grantor. In such context, we do so by looking not only to language in deeds, but variously to matters extrinsic to related written documents, including conduct, conversation, and correspondence. We stated in *Scholtes v. McColgan,* 184 Md. 480, 489, 41 A.2d 479, 483–84 (1945):

> The intention to adopt a general plan of development with restrictions may be indicated in different ways. When it is intended to adopt such a general plan, the simplest method is to include all of the restrictions in every deed, and to state that they bind not only the property conveyed, but also the property retained, and that they are placed upon the property for the benefit of the owners of all parts of it.

In *Schovee,* we observed that the Maryland cases considering implied restrictions on land retained by a common grantor have turned on two key inquiries: whether (1) there was a general plan of development, and (2) if so, the retained land was intended to be a part of the development. 356 Md. at 106, 737 A.2d at 585. We stated in *McKenrick v. Savings Bank,* 174 Md. 118, 128, 197 A. 580, 584–85 (1938):

> [I]f in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity; that covenants creating restrictions are

to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made; and that the burden is upon one seeking to enforce such restrictions, where they are not specifically expressed in a deed, to show by clear and satisfactory proof that the common grantor intended that they should affect the land retained as a part of a uniform general scheme of development.

In *McKenrick* and subsequent cases, the assertion of an implied reciprocal restriction arising from a general plan of development was not premised on any recorded declaration subjecting the land to restrictions, but was based either on the inclusion by a common grantor of uniform restrictions in individual deeds to specific lots or from oral commitments made to purchasers of lots subject to restrictions that subsequent conveyances of retained land would be subject to the same restrictions. *Schovee,* 356 Md. at 107, 737 A.2d at 586.

We commented on the origins of the doctrine of implied negative reciprocal covenants in *Schovee:*

In those early days, it was uncommon for the developer to evidence the development or impose uniform restrictions through a recorded Declaration that would later be incorporated in individual deeds. They often filed subdivision plats of one kind or another but did not take the extra step of using one instrument to impose the restrictions. The common, almost universal, practice, instead, was for the developer to place the restrictions in the deeds to individual lots and, sometimes, to represent to the purchasers of those lots that the same restrictions would be placed in subsequent deeds to the other lots. Litigation arose most frequently when the developer then neglected to include the restrictions in one or more of the subsequent deeds and those buyers proceeded or proposed to use their property in a manner that would not be allowed by the restrictions.

. . . .

Those were issues of fact, to be resolved from whatever relevant evidence was available—the individual deeds, any recorded plats, specific representations or promotional ma-

terials used in marketing the lots, and the testimony of the buyers as to their expectations.

356 Md. at 107–08, 737 A.2d at 586–87.

At issue in *Schovee* was a 168–acre development subdivided into twenty-five lots, each at least three acres in size. Lots 1– 5 and 8–25 consisted of between three and four acres apiece, although two of those lots were six acres. Lot 6 was nearly twenty acres and Lot 7, the focus of *Schovee*, consisted of about fifty acres. 356 Md. at 96, 737 A.2d at 580. When the developer recorded the initial subdivision plat, it recorded a Declaration of Covenants, Easements, Conditions and Restrictions which stated in its preamble that the Declaration applied to lots 1–5 and 8–25. Lots 6 and 7 were clearly excluded from the Declaration. *Id.* The restriction pertinent to that case provided that no lot could contain more than one detached residential structure, and further provided that "the covenants and restrictions were to run with and bind upon the property for forty years, subject to amendments approved by certain percentages of the owners, and were thereafter to be automatically renewed for successive terms of 10 years." 356 Md. at 97, 737 A.2d at 580.

The developer then sold twenty-three of the lots using lot reservation agreements that included a statement that the property was subject to recorded covenants and the buyer had fifteen days prior to recordation to approve the covenants. If the buyer objected to the covenants, the agreement would be void. 356 Md. at 97, 737 A.2d at 581. The contract of sale specifically referred to the Declaration which was attached to the contract as an exhibit and the deed also made specific reference to the Declaration. The contract contained an integration clause stating that the written agreement represented "the complete understanding between the parties," and superseded all prior negotiations, representations, promises, and statements as to the property. 356 Md. at 98, 737 A.2d at 581.

The plaintiffs in *Schovee* were seven couples who purchased lots from the developer claiming that they were led to believe

that Lot 7 was part of the "community" and thus subject to the Declaration. Mikolasko, the vice-president of a corporation which was in turn the general partner of the developer, owned Lot 7 and decided to combine it with Lot 8 and resubdivide the whole into nine new lots of between one and one-and-one-third acres each. 356 Md. at 98–99, 737 A.2d at 581. The homeowners protested.

The trial court found that Lot 8 was expressly subject to the covenants and disposed of that issue on motion for summary judgment. The remaining issue was whether Lot 7 was subject to the covenants under a theory of implied negative reciprocal easement. The plaintiffs presented evidence that Mikolasko or the real estate broker made representations to the homeowners that Lot 7 would be a part of the community and that Mikolasko would build his own home on that lot. 356 Md. at 100, 737 A.2d at 582. Mikolasko argued that § 7.5.3 of the Declaration authorized changes consistent with zoning regulations and that his resubdivision of Lot 7 was consistent with zoning regulations and therefore not in violation of the covenant. Section 7.5.3 provided that an owner may "amend the Community Plat with respect to those Lots owned by such Owner without consent of any other Owner, so long as such amendment complies with all laws, ordinances, rules and regulations of the County and the State of Maryland." 356 Md. at 97, 737 A.2d at 580.

The trial court rejected Mikolasko's view of § 7.5.3 and found that there was an intent to create a common scheme that would prohibit lots of less than three acres. The court, relying on our decision in *Turner*, found that restrictions may be enforced under the doctrine of implied negative reciprocal easements against land not expressly subject to them if the party seeking enforcement shows that the following factors are present:

(1) a common owner subdivided property into a number of lots for sale, (2) the common owner had an intention to create a general scheme of development for the property as a whole, in which the use of the land was restricted, (3) the vast majority of subdivided lots contain restrictive covenants

that reflect the general scheme, (4) the property against which application of an implied covenant is sought was intended to be part of the general scheme of development, and (5) the purchaser of the lot in question had notice, actual or constructive, of the condition.

356 Md. at 103, 737 A.2d at 583–84. The court held that each of these elements was satisfied and the evidence established a common scheme of development "for the property as a whole," in which the use of the property was restricted, and that Lot 7 was part of that overall scheme. 356 Md. at 103, 737 A.2d at 584.

The Court of Special Appeals affirmed the judgment as to Lot 8, but reversed as to Lot 7. The court distinguished *Turner* on the basis that it did not involve a recorded declaration. The court declared the principle that " 'when a common development scheme or subdivision is established by a recorded document setting forth the restrictions upon the property, which document also describes the property to be included, the presumption is raised that only the property therein described will be included in, and thus burdened and benefitted by the restrictions of, the common development scheme.' " 356 Md. at 104, 737 A.2d at 584 (quoting *Mikolasko v. Schovee*, 124 Md.App. 66, 80, 720 A.2d 1214, 1220 (1998)). The intermediate appellate court found that the facts were not sufficient to rebut the presumption that only the land expressly included in the Declaration was subject to it.

This Court affirmed the Court of Special Appeals's judgment, reasoning that, where the burden is stated expressly already, there is no need to imply the burden. We concluded that a written instrument imposing restrictive covenants is presumptive evidence of a grantor's intent and further concluded that purchasers cannot claim ignorance of what is set forth clearly in a recorded instrument in the chain of title to their lots, "especially when that instrument (1) is actually given to them, and (2) is specifically referred to in their contracts of sale and deeds." 356 Md. at 112–13, 737 A.2d at 589. We held that the Declaration, "when coupled with the language in the deeds, establishes with virtually unimpeach-

able clarity both that [the developer] did not intend to subject Lot 7 to the restrictions imposed on Lots 1 through 5 and 8 through 25, and that the purchasers of those lots knew, at least constructively, that Lot 7 was excluded from the Declaration." 356 Md. at 113, 737 A.2d at 589. We further found that the developer did not act inconsistently with the exclusion of Lot 7 from the community.

The lot owners initiating suit in *Turner v. Brocato* owned lots in a residential development subject to restrictions against use for business. They sought a declaration that the lot of the appellees, although deeded by the developer free of restrictions, was part of the development and therefore similarly restricted. *Turner*, 206 Md. at 339, 111 A.2d at 857. The developer had divided his property, known as Poplar Hill, into three sections. Each section underwent development at different times, but, once subdivided, each lot sold contained identical restrictions, known as the Poplar Hill restrictions. The deeds to each lot sold in sections A, B, and C contained the statement that the restrictions applied to each lot in the named section "but shall not apply to the other remaining property belonging to the party of the first part." 206 Md. at 340, 111 A.2d at 858. At issue in that case was a "finger" of land that bordered but was not developed as were sections A, B, and C. The "finger" was purchased by the appellees. Their deed did not contain the Poplar Hill restrictions, although the lot was recorded on the plat with the other sections of land. Testimony before the trial court indicated that many of the purchasers of lots in Poplar Hill would not have purchased their lots without restrictions on the "finger" similar to those contained in their deeds. 206 Md. at 343, 111 A.2d at 859.

The restrictions imposed on the Poplar Hill lots were of two types—the first related to front yard measurements, walls, open spaces, and approval of plans by architects; the second forbade maintenance or operation of noxious or offensive trades or businesses on the land conveyed and restricted the use of the land to use "for one single one-family residence only, together with a private garage for the sole use of the

owner of the lot upon which it is located, and other structures appurtenant to the main residence, to be used in connection therewith and not for the purpose of trade." 206 Md. at 344, 111 A.2d at 859–60. Testimony at trial indicated that the developer had reserved the right to waive the spatial restrictions, but not the right to waive the use restrictions so as to allow business in the development. *Id.*

Appellees intended to use their land to operate a dry cleaning establishment. They argued to this Court that they had neither actual nor constructive notice of any restrictions on their land and denied that any restriction was imposed by the developer. Relying on the facts that their land was unnumbered on the plat and unsuitable for residential use, they maintained that this was evidence of the grantor's intent not to burden appellees' land with the Poplar Hill restrictions. 206 Md. at 344–45, 111 A.2d at 860.

We found that the finger of land was a part of Poplar Hill and in its Section C. It was part of the tract purchased initially by the developer and it was shown as part of the development on all of the plats. 206 Md. at 345, 111 A.2d at 860. We noted further that the sign advertising Poplar Hill as a restricted residential development stood on the lot in issue for twenty years and the lot was always regarded by those who dealt with the property as a part thereof. *Id.* We commented that "the jurisdiction of equity to enforce certain rights in respect of land is not necessarily dependent upon technicalities which are so important at law." 206 Md. at 346, 111 A.2d at 860. Thus, the Court applied the doctrine of reciprocal negative easements and concluded that there was a common plan or scheme of development permitting the inference of intent that the restrictions were not for the personal benefit of the grantor, but rather for the common advantage and benefit of all who purchased from him; and further concluded that there was sufficient evidence that it was the intent of the grantor to impose the restrictions on all of the land included in the plat. 206 Md. at 350–51, 111 A.2d at 863.

Our reasoning in *Turner* focused on the common plan or scheme of development and whether it was the intent of the grantor to create such a common scheme. We noted that "whether there is a common plan or scheme of development which permits the inference of intent that the restrictions were not for the personal benefit of the grantor, but rather for the common advantage and benefit of all who purchased from him," can be found when

> there has been proof of a general plan or scheme for the improvement of the property, and its consequent benefit, and the covenant has been entered into as part of a general plan to be exacted from all purchasers, and to be for the benefit of each purchaser, and the party has bought with reference to such general plan or scheme, and the covenant has entered into the consideration of his purchase.

206 Md. at 349, 111 A.2d at 862 (quoting *Mulligan v. Jordan,* 50 N.J. Eq. 363, 24 A. 543, 544 (1892)). Each element was satisfied by the evidence presented at trial by the appellants. 206 Md. at 349–50, 111 A.2d at 862–63.

## C.

At oral argument before this Court, Ms. Camuso, for her part, conceded that the sweeping statement made by the Court of Special Appeals in its opinion in this case, asserting that the doctrine of implied negative reciprocal covenants never may be applied to situations other than those involving a common grantor who has retained land against which the covenants are sought to be enforced, is not a correct statement of the law. Instead, Ms. Camuso primarily mounted an evidentiary sufficiency argument asserting that the fourth factor of the *Schovee* test had not been met by Ms. Roper. She suggested that testimony as to the exact number of lots burdened by the covenants and the number of lots not yet sold or developed was lacking. She pointed-out that, although the plat was part of the record in the trial court, it did not indicate the number of lots and therefore did not aid Ms. Roper in meeting her burden of proof.

As iterated earlier in this opinion, the initial purpose for which the doctrine was developed was to provide redress for owners of lots burdened by covenants who purchased their lots believing that the common grantor intended all subsequent lots sold to be subject to the same restrictions. The doctrine is meant to preserve the uniform general scheme of development originally intended by the grantor. It is more a matter of happenstance, rather than necessity, however, that the majority of reported cases that have arisen involving the doctrine of implied negative reciprocal covenants concerned grantees, as plaintiffs, seeking to impose the covenants on the grantor who retained property, instead of grantees seeking to enforce the restrictions against other grantees or, as in the present matter, a grantee seeking to subject her property to the covenants so that she may have standing to enforce those covenants against another grantee whose lot is burdened expressly by the covenants. The underlying, fundamental purposes of the doctrine are not furthered by denying Ms. Roper the opportunity to avail herself of its protections. The doctrine consistently has been employed to protect the expectations of grantee land-owners.

We established in *Turner* the evidentiary threshold that must be crossed to demonstrate that land not expressly subject to restrictive covenants was intended to be subject to restrictive covenants pursuant to the implied negative reciprocal covenants doctrine. Of the five factors enumerated in *Turner*, only the fourth is at issue in this matter and we therefore consider here only whether Ms. Roper's lot was intended to be subject to the common plan.

In *Turner*, we concluded that a common plan existed and the disputed lot was intended to be subject to the Poplar Hill covenants on the basis of the presence of the restrictions in the individual lots sold and despite the declaration that the restrictions "shall not apply to the other remaining property belonging to the party of the first part"; the testimony of purchasers that they would not have purchased their lots without the assurance that the entire community would be subject to the covenants; the presence of the disputed lot on

the recorded plat although it was unnumbered; and, a widespread belief that the disputed lot was part of the restricted residential community. 206 Md. at 340–43, 111 A.2d at 858–59. We find our analysis in *Turner* to be an effective guide to resolving the present case.

Our reasoning in *Adams v. Parater* also sheds some light on the correct analytical path to follow in the matter at hand. That case involved properties subject to restrictions prohibiting in part the use of the premises for the manufacture, sale, or keeping for sale of "spiritous or malt liquors." The grantor in that case purchased a tract of land later subdivided into ninety-nine lots and known as Woodlane. 206 Md. at 227, 111 A.2d at 591. The appellant and appellee were each owners of lots in Woodlane. The plat of Woodlane was filed and most of the deeds to lots in the subdivision were recorded containing six restrictions said to run with the land. Only four lots were conveyed by deeds not containing the restrictions. 206 Md. at 228, 111 A.2d at 591. The relevant covenant contained in the deeds prohibited "the making, sale, or keeping for sale of spirituous or malt liquors." *Id.* Parater filed for and was granted a license to sell beer on his premises. Thereafter, suit was filed by numerous lot owners in Woodlane. 206 Md. at 229, 111 A.2d at 592. Relying on *Schlicht v. Wengert,* 178 Md. 629, 15 A.2d 911 (1940), we reasoned that "[a]n inference which appears with sufficient clearness from any source should be accepted," and concluded that "the fact that a few lots are not subject to restrictions is not fatal to the existence of a general plan." 206 Md. at 230, 111 A.2d at 592. We have also stated in previous cases that the uniform imposition of restrictions in all deeds conveying property from the same grantor is not sufficient to establish the existence of a general plan of development without additional evidence. *Club Manor,* 211 Md. at 477, 128 A.2d at 411.

There is sufficient evidence in the record of the present case to support the conclusion that a common plan of development existed and was intended to exist by the grantor. Moreover, the evidence supports the premise that Ms. Roper's lot was intended to be part of that community and thence subject to,

and reciprocally able to enforce, the Spring Meadows covenants.

Both parties rely on *Schovee*, although that case is factually distinguishable from the present matter. The developer in *Schovee* expressly excluded Lot 7, the property he retained, from the restrictions applying to the other lots. Each sales contract included the exclusionary language so that each individual buyer had notice that Lot 7 was not part of "the Community" subject to the restrictions. 356 Md. at 96–97, 737 A.2d at 580. Although the plaintiffs testified that they believed Lot 7 was subject to the covenants, we found that the express language in the declaration attached to each contract of sale made such belief unreasonable. We noted that "purchasers cannot be allowed to claim ignorance of that which is clearly set forth in a recorded instrument in the chain of title to their respective lots, especially when that instrument (1) is actually given to them, and (2) is specifically referred to in their contracts of sale and deeds." 356 Md. at 112–13, 737 A.2d at 589. Concluding that the doctrine of implied negative reciprocal covenants did not apply to the facts in *Schovee*, we distinguished that case from a situation where application of the doctrine would be appropriate:

We need to keep in mind both the function of the implied negative reciprocal easement doctrine, which is to serve as a basis for subjecting land not otherwise burdened by them to restrictions applicable generally throughout a planned development, and its historical context. To the extent that land is expressly subjected to restrictions by an instrument forming part of its chain of title, the doctrine would ordinarily have no application, for there is no reason to *imply* a burden that is already *expressly* imposed. The interplay between the doctrine and an instrument (or combination of instruments) that both creates the uniform restrictions and delineates the land subject to them arises only with respect to land not expressly included under the instrument and then only from the implication that, by delineating the land included under the instrument, the grantor intended that the restrictions apply only to that land and no other.

356 Md. at 112, 737 A.2d at 588–89. Although we found the declaration at issue in *Schovee* to establish with "virtually unimpeachable clarity" that the developer did not intend to subject Lot 7 to the restrictions imposed on the lots comprising "the Community," no such clarity is apparent on the record of the instant case.

■ The evidence clearly establishes that Spring Meadows was developed as part of a unified scheme of development and that Ms. Roper's lot was intended to be included in that common plan and thereby subject to its restrictions. Although Ms. Camuso correctly asserts that covenants are required to be construed based on the intent of the parties as expressed in the specific written instrument of conveyance, if the instrument is insufficient to show intent extrinsic evidence may be considered. Given the ambiguous language in the deed, we resort to review of available extrinsic evidence to determine whether the disputed lot was intended to be part of the community and subject to the covenants.

The record indicates that Miller developed Spring Meadows as a residential community of open spaces with panoramic views and as an equestrian community with bridal paths running along the rear of many properties. The Spring Meadows covenants imposed uniform restrictions on every lot owner in that development, except for that of Ms. Roper. Even her deed, however, included the language that it was "subject to covenants and restrictions of record." She received copies of the covenants on multiple occasions. Mr. Miller testified that the covenants were meant to be enforced by either the developer or the grantees and he explained how each of the covenants was meant to benefit the community. He stated his belief "that the covenants are there to serve the community," and when the grantees purchased their lots, "they bought into the covenants." Testimony by Ms. Roper indicated that, as such a purchaser, she bought her lot in part because it had a bridle path for her horses and because of the "beautiful view of rolling hills." These interests are the same interests Mr. Miller testified the covenants were intended to secure. Ms. Roper also testified that she purchased her lot

believing it to be subject to the covenants and sought to abide by the covenants at all times, although, as we shall observe *infra*, that testimony and her actual conduct may be at odds, with possible attendant repercussions as to her claims in this litigation.

The Architectural Review Committee's actions, by writing Ms. Roper the letters challenging her compliance with the covenants, indicate an assumption that her lot was subject to the Spring Meadows covenants. The language of the letters, reproduced *supra* at 16–17, expresses an unambiguous assumption that Ms. Roper's lot was subject to the covenants the letters sought to enforce. Ms. Roper herself assumed she was subject to the covenants, and her neighbors also believed her lot to be subject to the covenants. There is no evidence in the record indicating that the developer intended specifically to exclude Ms. Roper's lot from the general plan of Spring Meadows. The common plan indicated by the evidence would suffer if Ms. Roper's lot were determined not to be subject to the covenants. Her lot would be the only one in the community excepted from the burdens of the Spring Meadows restrictions. Such a result is contrary to the stated purposes of the covenants.

The trial court erred by not finding Ms. Roper's lot to be subject to the covenants. We hold, therefore, that the doctrine of implied reciprocal covenants gives Ms. Roper threshold standing to seek enforcement of the covenants.

This conclusion, however, does not resolve definitively the matters before us. Ms. Camuso alleges that Ms. Roper is barred from seeking the court's aid on the grounds of "unclean hands." The trial court did not reach this issue given its view as to Ms. Roper's standing. Upon our review of the record, we conclude that there was a triable issue whether Ms. Roper should be barred from bringing a claim against Ms. Camuso under the doctrine of "unclean hands."

Following the jury trial portion of the proceedings below, the jury found that Ms. Roper trespassed on Ms. Camuso's property on numerous occasions and destroyed branches on

her trees. The record also contains evidence supporting the argument that Ms. Roper, by maintaining a fence that arguably exceeds the permissible height restriction in the covenants, may have violated the very covenants she sought to enforce against Ms. Camuso. A reasonable fact-finder may find it inequitable for Ms. Roper to enforce the covenants against her neighbor if she refused to comply with the covenants herself, despite repeated attempts on behalf of the community to bring the violation(s) to her attention.

We have stated in prior cases that the purpose of the clean hands requirement is not to punish the wrongdoer, but to "protect the courts from having to endorse or reward inequitable conduct." *WinMark Ltd. P'ship v. Miles & Stockbridge,* 345 Md. 614, 628, 693 A.2d 824, 830 (1997). We expressed the linchpin for application of the clean hands defense in *Adams v. Manown,* 328 Md. 463, 476, 615 A.2d 611, 617 (1992):

> It is only when the plaintiff's improper conduct is the source, or part of the source, of his equitable claim, that he is to be barred because of his conduct. What is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts.

Ms. Roper seeks injunctive relief requiring Ms. Camuso to remove her trees along the common boundary. Ms. Roper herself trespassed onto Ms. Camuso's property on several occasions to attempt to remove offending branches of the trees that crossed from the Camusos' lot onto her lot. The evidence suggests, although no finding was made below, that Ms. Roper may have refused to abide by the covenants to which we have determined she is subject and yet asked the court to enforce against Ms. Camuso her claims premised on the same covenants. The trial court, in the first instance, should consider Ms. Roper's requested relief in this light.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE DISMISSAL OF COUNT #2 OF PETITIONER'S COUNTERCLAIM BY THE CIRCUIT COURT OF MONTGOMERY COUNTY*

*AND TO REMAND THE MATTER TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*