758 N.W.2d 376 (2008)
276 Neb. 792
SKYLINE WOODS HOMEOWNERS ASSOCIATION, INC., et al., appellees and cross-appellants,
v.
David A. BROEKEMEIER, an individual, et al., appellants and cross-appellees.
Paisley, LLC, a Nebraska limited liability company, appellee and cross-appellant,
v.
Liberty Building Corporation, a Nebraska corporation, appellant and cross-appellee.
Nos. S-07-952, S-07-953.
Supreme Court of Nebraska.
December 5, 2008.
*380 David A. Domina, Omaha and Brian E. Jorde, Birmingham, MI, of Domina Law Group, P.C., L.L.O., for appellants.
James D. Sherrets and Diana J. Vogt, of Sherrets & Boecker, L.L.C., Omaha, for appellees Skyline Homeowners Association, Inc., et al., in No. S-07-952.
James E. Lang, Omaha and Kathleen M. Foster, of Laughlin, Peterson & Lang, for appellee Paisley, LLC, in No. S-07-953.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

I. NATURE OF CASE
Liberty Building Corporation (Liberty) and its owners appeal from the district court's order finding that the property purchased by Liberty in a chapter 11 bankruptcy sale is burdened by restrictive covenants limiting its use to a golf course. Liberty wished to develop the property for other purposes, but homeowners adjacent to the property filed suit to compel its continued maintenance as a golf course. The parties dispute whether implied enforceable restrictive covenants requiring the property to be maintained and operated as a golf course run with the land and whether the bankruptcy order authorizing the sale of the property to Liberty extinguished any such covenants.

II. BACKGROUND
As early as 1967, the property in dispute was operated as a golf course, then known as Chapel Hills Farm and Golf Course. Since that time, its ownership has changed hands many times. The parties agree, however, that sometime in 1969, a group of partners, including Seb A. Circo, purchased the golf course property, although the record does not contain the deed to this transaction. Between 1969 and 1977, the chain of title for the golf course property is unclear. Sometime around 1977, Dennis Circo (Circo), owner of Paisley, LLC, and the chairman of the board and chief executive officer of Precision Industries, acquired the golf course. Circo and his father, Seb, eventually formed a limited partnership called Skyline Golf Club, Ltd. (Skyline Golf), and changed the name of the golf course to Skyline Woods.
Circo also owned a significant amount of land abutting the golf course. He eventually developed the "Skyline Woods" residential area, selling the lots where the *381 plaintiff homeowners and Circo now live. When selling the lots, Circo advertised the proximity and existence of the Skyline Woods golf course. In fact, Circo testified that the golf course was the "center and the heart" of the residential development project.
In 1990, Circo sold the Skyline Woods golf course to American Golf Corporation (American Golf). Circo kept the residential lots that had not yet been sold. Eventually, American Golf merged with National Golf Operating Partnership, L.P. Then, the partnership conveyed the property by special warranty deed to Skyline Woods Country Club, L.L.C. (Skyline Country Club).

1. BANKRUPTCY SALE
In late 2004, Skyline Country Club filed for bankruptcy in the U.S. Bankruptcy Court for the District of Nebraska. The homeowners in the Skyline Woods development were not included in the Skyline Country Club creditor's matrix, and their claimed restrictive covenants were not specifically raised. On February 9, 2005, the bankruptcy court entered an order approving the sale of the golf course property to Liberty, which is owned and operated by David A. Broekemeier and Robin Broekemeier.
The bankruptcy court's order approved the sale of the property "free and clear of all mortgages, liens, pledges, charges, ... easements, options, rights of first refusal, restrictions, judgments, claims, demands, successor liability, defects or other adverse claims, interests or liabilities of any kind or nature (whether known or unknown, accrued, absolute, contingent, or otherwise)." Pursuant to the bankruptcy order, on February 11, 2005, Skyline Country Club issued a warranty deed to Liberty, conveying the property "free from encumbrance except covenants, easements and restrictions of record."

2. LAWSUIT
Shortly after purchasing the property, David Broekemeier called a meeting with the members of Skyline Country Club to inform them that because of the bankruptcy sale, he was not bound by their existing membership contracts and would not be honoring them. Liberty operated the property as a golf course for only 1 year, did not rehire the staff, and did not honor the original membership contracts, which brought in $70,000 a month from the club members. Further, David Broekemeier testified that he had no intention of reopening the golf course in its then-present condition.
The condition of the golf course property has deteriorated since Liberty purchased the property. David Broekemeier himself admitted that the property is in a worse condition now than it was when Liberty purchased it. Circo testified that trees have been uprooted and left on the property and that water has been taken out of the pond located on the 12th hole, causing algae growth and other problems such as an increase in mosquitoes. A licensed real estate broker testified that the property is in horrible condition, as the lagoons are unhealthy and the property is covered in weeds. In fact, he described the property as "a real eyesore."
Skyline Woods Homeowners Association, Inc.; The Villas at Skyline Woods Homeowners Association; and numerous individual homeowners (collectively Homeowners) filed suit against Liberty and the Broekemeiers in the district court for Douglas County, Nebraska, to compel Liberty and the Broekemeiers to maintain the property as a golf course. Homeowners asked the court to enter a temporary restraining order and temporary and permanent *382 injunctions ordering Liberty and the Broekemeiers to cease and refrain from destroying or interfering with the continued maintenance and operation of the golf course and to comply with all state and local laws and ordinances regarding maintenance of private property. Finally, Homeowners asked the court to award monetary damages.
In a separate action, Paisley filed suit against Liberty, alleging trespass and breach of restrictive covenants.

3. DOCUMENTARY EVIDENCE
At trial, various documents were entered into evidence that purported to demonstrate an implied restrictive covenant to maintain the property as a golf course.

(a) Land Contract
A land contract was recorded in 1976, wherein Skyline Golf agreed to sell the property to the "Office of Willis Mouttet, Inc." The land contract specifically identified the property as a golf course and clubhouse and required the buyer to maintain the course in its then "present condition" "during the term of this agreement to prevent the course from deteriorating." The land contract also referenced Willis Mouttet's plan for developing residential lots in combination with the golf course and country club. The record is not clear whether ownership of the property actually passed under the land contract. If it did, the property was apparently later reconveyed to Skyline Golf.

(b) Declaration of Protective Covenants
A "Declaration of Protective Covenants" was recorded on April 10, 1981, which placed requirements on homes built on the residential lots adjacent to the golf course, including the following:
No unused building material, junk, or rubbish shall be exposed on any property except during actual building operations.
... No property owner may golf on the fairways just behind his or her house, nor on any part of the golf course except starting and paying at the clubhouse.
... No perimeter fencing shall be allowed....
... No trees with trunks over one inch in diameter shall be moved, removed, damaged or destroyed without prior written approval of the Architectural Control Committee.

(c) Second Amendment to Declaration of Protective Covenants
In 1983, Skyline Golf recorded a "Second Amendment to Declaration of Protective Covenants" burdening the abutting residential lots. The second amended covenants added the requirement that "[t]he windows of all dwellings shall have a protective covering consisting of (i) plexiglass, (ii) laminated glass, (iii) tempered glass, (iv) a wire screen or (v) such other protective covering as may be approved by the Architectural Control Committee."

(d) Third Amendment to Declaration of Protective Covenants
Skyline Golf recorded a "Third Amendment to Declaration of Protective Covenants" in 1985. This amendment created an architectural control committee "`[i]n order to maintain and establish continuity, integrity, beauty and uniqueness of the development.'"

(e) Ratification and Reaffirmation of Declaration of Protective Covenants
In 1986, Skyline Golf recorded a "Ratification and Reaffirmation of Declaration of Protective Covenants." This document includes the following statement of intent:

*383 NOW, THEREFORE, with the intent of establishing a general plan for the development and use of the aforedescribed property meant to secure the enforcement of the existing restrictions and covenants upon the usage and development of all said lots, Declarant hereby announces, ratifies and reaffirms the Original Covenants ... and announces and declares that said covenants are and shall be binding upon, [and] adhere to the benefit of, and apply to [Skyline Golf], as well as its respective successors and assigns....

(f) Golf Easement
On May 18, 1990, Circo recorded an easement against the properties of homeowners in the Skyline Woods subdivision to ensure the use of the property as a golf course was not disturbed by the adjacent homeowners. It required that golf balls be allowed to go through the air and across the homeowners' grass. Specifically, the golf easement states:
Grantor reserves an easement as hereafter described, in the entire airspace above, and upon the entire real property and improvements described in [the legal description] attached hereto, to permit the doing of every act necessary and proper to the playing of golf on the golf course (which is the dominant tenement ...) adjacent to the land which is the subject of these restrictions (which is the subservient tenement...).

(g) Purchase Agreement
A 1990 purchase agreement evidenced the sale of the golf course by Circo to American Golf, although the agreement was never recorded and does not appear in the chain of title. Paragraph 9.2 of the purchase agreement states, "Buyer covenants that, subsequent to Closing, it shall maintain the golf course in a manner and condition equal to or better than the standard of course maintenance which Seller has applied in its operation of the course."

(h) Memorandum of Understanding
A 1990 memorandum of understanding (MOU) between Circo and American Golf provided instructions on necessary improvements and maintenance of the golf course. The MOU was not recorded at the time of the purchase, but it was recorded later, in 1997, as an attachment to an "Assignment of Memorandum Rights." The MOU referenced the unrecorded purchase agreement and attempted to incorporate the terms of the purchase agreement by reference.
Paragraph 8 states in pertinent part:
It is understood and agreed to by Seller and Buyer that any successor Subdivision developer or any successor Skyline [Woods golf course] titleholder shall be subject to all of the rights, obligations, terms and conditions of this [MOU] to the same extent as are Seller and Buyer. These terms and conditions are intended to and shall be a covenant running with and burdening all of the land upon which Seller (or a subsequent titleholder involved in development and construction of residential housing for re-sale) may construct residential housing adjacent to Skyline [Woods golf course] in the future, and shall also be a covenant running with and burdening Skyline [Woods golf course], and this covenant may be recorded at either party's option.

(i) Memorandum of Memorandum of Understanding
On December 28, 1990, the parties entered into a "Memorandum of Memorandum of Understanding," again referencing the unrecorded purchase agreement. It again stated that the terms of the unrecorded purchase agreement "shall be a covenant running with and *384 burdening the Golf Course," but it did not specify the terms of the unrecorded purchase agreement. This document was recorded on December 31 and appears in the chain of title.

4. OTHER EVIDENCE
David Broekemeier admitted he was aware of all the restrictions and covenants referencing or affecting the golf course listed aboveexcept for the unrecorded purchase agreement. Liberty's title insurance policy specifically excluded "[e]asements, claims of easement or encumbrances which are not shown by the public records." The policy listed as exceptions to the golf course property title all the restrictions on the property appearing of record as well as "[a]ny facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof" on the property.
Additionally, Liberty owns property which abuts Skyline Woods golf course called Ranch View Estates. Liberty advertised the sale of lots in Ranch View Estates by referencing the proximity of the golf course. David Broekemeier also told prospective purchasers about the proximity to and benefits of living near the golf course.

5. DISTRICT COURT'S ORDERS
On April 26, 2006, the district court issued a temporary restraining order against Liberty and the Broekemeiers. The temporary restraining order prohibited Liberty and the Broekemeiers from taking any actions that would interfere with or damage the golf course or prevent the property from being used as a golf course.
On June 13, 2006, the district court consolidated Homeowners' and Paisley's causes of action for the convenience of arguments. Also, at that time, the parties entered into a joint stipulation. Under the stipulation, Liberty and the Broekemeiers agreed to maintain the property in accordance with specified standards during the pendency of the litigation. The joint stipulation mandates, as follows:
1. All fairways and greens on the Golf Course property will be mowed within fourteen (14) days of the execution of this Stipulation. The property will be mowed from the abutting property owners' residential lots, out a distance of 12 to 15 feet into the golf course. All grass that is to be mowed shall be mowed to a length of five (5) inches and will be mowed again whenever it achieves the length of six and one half (6.5) inches. (But not the rough which shall not be mowed except as otherwise provided herein.)
2. Any grass clippings or materials will be removed from the Golf Course property within seven (7) days after the initial mowing or the same shall be thoroughly mulched. Thereafter, when cut the grass clippings will either be removed from the Golf Course property or the grass will be mulched consistent with proper turf grass maintenance. Any fallen trees cut down by Defendants on the property will be removed within thirty (30) days of the execution of this Stipulation.
3. Steps will be taken to repair the pumps on the Golf Course property by all necessary and appropriate means, including obtaining permits or other steps necessary to provide access to the same.
4. The fairways on the Golf Course property (other than the greens) will be watered in a prudent manner so that it will remain green to the point that it not be allowed to become dormant. To the extent the greens are already dormant, *385 they need not be watered to counter their dormancy.
5. The use of "Round-up" and other herbicides or weed killing materials will be applied only to weeds on the Golf Course property. (Herbicides and other materials customarily applied to golf courses may be utilized.)
6. Cut trees and/or brush has been placed on the parcel owned by Paisley LLC by Defendants. Said cut trees and/or brush will be removed within thirty (30) days from the execution of this Stipulation.
7. Defendants may use the well on the Paisley parcel for irrigation purposes and may access the same as necessary to operate or repair the well but Defendants will not otherwise go onto the Paisley property. Notwithstanding the foregoing, access for ingress and egress across the Paisley property is granted as necessary to effect the provisions of this Order.
On March 28, 2007, the district court granted partial summary judgment in favor of Homeowners and Paisley on the issue of whether restrictive covenants "limiting the use of the property to that of a golf course" ran with the land. In concluding that restrictive covenants exist burdening the golf course property, the court relied on these six documents: (1) the 1976 land contract, (2) the 1981 declaration of protective covenants, (3) the 1983 second amendment to declaration of protective covenants, (4) the 1990 unrecorded purchase agreement, (5) the 1990 MOU (not recorded until 1997), and (6) the 1997 assignment of memorandum rights with the attached MOU. From these documents, the court concluded that the parties intended that the covenants run with the land. The order did not conclude that the restrictive covenants required Liberty and the Broekemeiers to actually operate the property as a golf course.
The court also concluded that the bankruptcy order did not sell the property free and clear of the restrictive covenants, as the restrictive covenants are property rights belonging to third-party Homeowners. Subsequently, a trial was had on all the remaining issues except for Paisley's cause of action for trespass.
The court's judgment was against the individual defendants, David Broekemeier and Robin Broekemeier, as well as Liberty. The record does not reveal that the Broekemeiers challenged Homeowners' petition against them as individuals or the district court's order as such. The court overruled Liberty and the Broekemeiers' cross-motion for summary judgment. Liberty and the Broekemeiers moved for a "New Trial" on the summary judgment proceedings, and Homeowners and Paisley moved to clarify the order.
After the trial, on August 10, 2007, the court issued an order finding that Homeowners failed to prove their causes of action for promissory estoppel, intentional misrepresentation, nuisance, and breach of contract for third-party beneficiaries. This order made additional findings as well as restated and consolidated its findings of March 28, 2007.
The August 10, 2007, order concluded and stated that restrictive covenants burden the golf course property, requiring that Liberty and the Broekemeiers use the property only as a golf course or maintain the property "in the appropriate fashion as a golf course or an attractive lawn." The court specifically ordered that Liberty and the Broekemeiers "properly and timely" trim, mow, water, and fertilize the grounds; maintain the trees, shrubs, and other growth on the property; maintain the ponds so that they are attractive; and maintain the property in a manner preventing *386 the value of the surrounding homes from declining.
The court explicitly stated, however, that it was not yet making any determination as to Paisley's cause of action for trespass. While the record reflects that the parties discussed certifying the August 10, 2007, order pursuant to Neb.Rev.Stat. § 25-1315(1) (Cum. Supp. 2006), the court, in fact, did not issue any order of certification before the parties' notices of appeal were filed with this court.
Following the August 10, 2007, order, Liberty and the Broekemeiers appealed and Homeowners and Paisley cross-appealed. On appeal, Liberty and the Broekemeiers filed two separate notices of appeal. There are separate transcripts on appeal (because they filed two separate docketing fees), and separate briefs addressing their respective issues were filed by Homeowners, case No. S-07-952, and Paisley, case No. S-07-953. We consolidated the cross-appeals of Homeowners and Paisley for the purpose of oral argument.

III. ASSIGNMENTS OF ERROR
Liberty and the Broekemeiers allege, consolidated and restated, that the district court erred in (1) concluding that the bankruptcy court's judgment directing sale and delivery of title to Liberty left the real estate encumbered by implied restrictive covenants requiring the property be maintained as a golf course, (2) entering judgment against the Broekemeiers as individuals, and (3) failing to find that Liberty and the Broekemeiers were protected by Nebraska's statutes governing the impact of unrecorded instruments on subsequent purchasers.
On cross-appeal, Homeowners and Paisley assert that the district court erred in finding it could not order Liberty and the Broekemeiers to operate the property as a golf course or, alternatively, order that the property be sold or leased to an entity that would operate it only as a golf course. Homeowners also assigned as error the court's dismissal of Homeowners' cause of action for nuisance.

IV. STANDARD OF REVIEW
A case in equity is reviewed de novo on the record, subject to the rule that where credible evidence is in conflict on material issues of fact, the appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.[1]

V. ANALYSIS

1. JURISDICTION
Before reaching the legal issues presented for review, it is the power and duty of an appellate court to determine whether it has jurisdiction over the matter before it irrespective of whether the issue is raised by the parties.[2] When multiple causes of action are presented or multiple parties are involved and final judgment is entered as to one of the parties or causes of action, but not the remaining causes of action or parties, § 25-1315(1) mandates the court certify the final judgment in order for the judgment to be appealable.[3] In the present case, the August 10, 2007, order disposed of all Homeowners' causes *387 of action. However, it only disposed of Paisley's cause of action for breach of contract and specifically made no determination as to Paisley's other cause of action for trespass. We determine that the order was final as to Homeowners but not as to Paisley. We thus lack jurisdiction in case No. S-07-953.

2. COVENANTS
We first consider whether the district court was correct in concluding that an implied covenant restricts Liberty's land to usage as a golf course and that Liberty and the Broekemeiers had constructive notice of such covenant. It is possible for a restrictive covenant to arise by implication from the conduct of parties or from the language used in deeds, plats, maps, or general building development plans.[4] Such an implied restrictive covenant has been defined as "a covenant which equity raises and fastens upon the title of a lot or lots carved out of a tract that will prevent their use in a manner detrimental to the enjoyment and value of neighboring lots sold with express restrictions in their conveyance."[5]
In order for implied restrictive covenants to exist, there must be a common grantor of land who has a common plan of development for the land.[6] If there is a common plan of development that places restrictions on property use, then such restrictions may be enforced in equity.[7] "A court's primary interest in equity is to give effect to the actual intent of the grantor ... by looking not only to language in deeds, but variously to matters extrinsic to related written documents, including conduct, conversation, and correspondence."[8]
To enforce an implied restrictive covenant against a subsequent owner of land, the subsequent purchaser must have actual or constructive knowledge of the implied restrictive covenant.[9] However, it should be noted that because implied restrictive covenants mandate relaxation of the writing requirement, courts are generally reluctant and cautious to conclude implied restrictive covenants exist.[10]
In Wessel v. Hillsdale Estates, Inc.,[11] we were faced with express protective covenants by the developer to preserve land for a park for the surrounding homeowners' enjoyment, but the covenants failed to specify how much land would be set aside for that purpose. However, the original plat and brochures used by the developer to sell the lots designated a particular 4.35-acre lot as "`Community Unit Area,'" and several covenants made reference to the variety of uses of the park.[12] We concluded that the protective covenants, read in their entirety, implied an amount of land "sufficient" for a park and recreational area with the variety of uses *388 referred to in the covenants.[13] While we did not compel the developer to use the entirety of the 4.35 acres for recreation purposes, we stated that it would be absurd to conclude that the 50-by 80-foot parcel the developer had proposed to set aside would be sufficient.[14]
Instead, we concluded that the amount of land used to build the park and recreation area had to be in accordance with the buyer's expectations, stating:
"A restrictive covenant is to be construed in connection with the surrounding circumstances, which the parties are supposed to have had in mind at the time they made it; the location and character of the entire tract of land; the purpose of the restriction; whether it was for the sole benefit of the grantor or for the benefit of the grantee and subsequent purchasers; and whether it was in pursuance of a general building plan for the development of the property."[15]
We ultimately held that 2.35 acres of the lot had to be used for the conceived park and recreation area.
We have never directly addressed whether a restrictive covenant will be implied simply from a common scheme or plan where there are no express covenants found in the chain of title. But other courts faced with a common scheme or plan have invariably found an enforceable restrictive covenant where it is sufficiently implied by the conduct and expectations of the parties and any documents of record or it is known to the buyer.[16]
In Shalimar Ass'n v. D.O.C. Enterprises, Ltd.,[17] for instance, the court held that there was an implied restrictive covenant to maintain property as a golf course despite the fact that there were no express covenants burdening the golf course property on behalf of the adjoining homeowners. Nevertheless, all of the adjacent homeowners' properties had various easements and restrictions limiting specific improvements and prohibiting homeowners from taking certain actions that would interfere with the use of the adjoining golf course property. Moreover, sales materials the developer distributed to the purchasers of the adjacent properties represented that there would be a golf course maintained for their benefit.[18]
The court concluded that the common plan of development, which included a golf course, combined with the representations made to the purchasers about the maintenance of the golf course and the adjoining homeowners' express covenants, created an implied restrictive covenant that the land be used only as a golf course.[19] The court explained that the homeowners who purchased property because of the proximity of the golf course were entitled to ensure their expectations that the golf course would remain.[20]
*389 The defendants in Shalimar Ass'n argued that because they checked the recorded documents against the golf course property and no restrictions were found, they should not be bound by the implied restrictive covenant.[21] But the court concluded that the new owners had constructive notice because they were aware that the seller of the golf course told the new owners that the property was restricted to use as a golf course, they knew the property was being operated as a golf course at the time of purchase, they knew of a recorded golf course plat, and they knew that the golf course was surrounded by residential lots designed to take advantage of the views of the golf course property.[22] The court concluded that the defendants failed to satisfy their duty of inquiry and that, had they inquired properly, they would have discovered the implied covenants.[23]
Similarly, in Ute Park Summer Homes Ass'n v. Maxwell Land Gr. Co.,[24] the court found an implied restriction for the land's continuing use as a golf course. Although this case is not directly on point because it involved a suit by lot owners directly against the developer and not his successor, the court, in its decision, focused on the representations made to prospective purchasers and the materials used in the sales of the lots.[25] When the developer in Ute Park Summer Homes Ass'n sold subdivided lots, he had distributed maps which pictured an area marked "golf course."[26] After selling these lots, the developer tried to sell the golf course without any restrictions on its use.[27] Even though the maps had not been recorded and none of the deeds contained any reference to the map or to any interest in the golf course, the court concluded that the lot owners had a legal right to use the area as a golf course.[28] The court concluded that when a map or plat showing a park or other like open area is used to sell property, "the purchaser acquires a private right, generally referred to as an easement, that such area shall be used in the manner designated. As stated, this is a private right, and it is not dependent on a proper making and recording of a plat for purposes of dedication."[29] Further, the court noted:
The rationale of the rule is that a grantor, who induces purchasers, by use of a plat, to believe that streets, squares, courts, parks, or other open areas shown on the plat will be kept open for their use and benefit, and the purchasers have acted upon such inducement, is required by common honesty to do that which he represented he would do. It is the use made of the plat in inducing the purchasers, which gives rise to the legally enforceable right in the individual purchasers, *390 and such is not dependent upon a dedication to public use, or upon the filing or recording of the plat.[30]
In the present case, the record does not contain the plats or maps to which any of the deeds refer. However, the record is replete with testimony supporting the existence of a common scheme of development establishing implied restrictive covenants. Circo owned both the golf course property and the developmental property adjacent to the golf course, and he testified that he developed the residential lots in the subdivision "specifically with the belief and it panned out that the lots would be more valuable if there was a successful golf course  actually a country club." Circo also testified that the golf course was the "center and the heart" of the residential development project. Further, Circo testified that when he sold the golf course property, he sold it to a buyer, American Golf, that he was sure would maintain the golf course. Such testimony from Circo leaves no doubt that the residential lots and golf course are part of a common scheme and plan.
Moreover, Circo sold the residential lots using advertisements that centered around the existence of the golf course and country club. Circo testified that the marketing plan for the sale of the residential lots "was an elegant or country club or leisure lifestyle." Several homeowners whose homes abut the golf course testified that they bought their property and paid a premium price for the property because of the proximity of the golf course and the lifestyle offered.
Not only did homeowners rely on the existence of the golf course when purchasing their property, they also have been required to take certain precautions for their property because of the golf course. Like Shalimar Ass'n, the homeowners have recorded restrictions placed on their properties referencing and affecting the golf course, which supports the existence of a common scheme or plan giving rise to an implied restrictive covenant.
We conclude that homeowners who bought their property relying on the proximity and existence of the golf course should be protected by implied restrictive covenants that the property be maintained as a golf course. We therefore agree with the district court that an implied restrictive covenant requiring that it be used only as a golf course burdens and runs with the golf course property. As to maintenance, we conclude that the June 13, 2006, joint stipulation entered into between the parties should continue as the standard of maintenance of the golf course.
Liberty and the Broekemeiers argue, however, that even if there is a restrictive covenant running with the land which would be enforceable against them in common law, such covenant is unenforceable under Nebraska's recording statute[31] because it was unrecorded. This argument is without merit. As discussed above, implied restrictive covenants are only enforceable against a subsequent purchaser who buys the property and has knowledge of the covenants.[32] As we said in Shonsey v. Clayton,[33] "[t]he recording acts have not abolished the equity rule as *391 to actual and constructive notice." Under this rule, we consider whether there are circumstances which, in the exercise of common reason and prudence, ought to put a man upon particular inquiry. If so, then the purchaser will be charged with notice of every fact which an inquiry, if made, would have given him or her.[34]
The Broekemeiers had notice of the implied restrictive covenants burdening the golf course property and failed to satisfy their duty of inquiry. David Broekemeier admitted that he knew that the property was used as a golf course since the early 1980's and that he also knew from the title policy of the restrictions and requirements placed on the homeowners' properties designed to protect the use of the adjacent golf course. To their detriment, neither the Broekemeiers nor their or Liberty's attorneys made any effort to inquire about how the surrounding homeowners would be protected.
Additionally, Liberty obtained a title insurance policy which included the restrictions and requirements filed against the surrounding homeowners' properties. This policy specifically excluded "[e]asements, claims of easement or encumbrances which are not shown by the public records" and listed as exceptions to the golf course property title all the restrictions on the property appearing of record as well as "[a]ny facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof" on the property. These facts would most certainly alert a potential, prudent buyer of the possibility of restrictions on its use.
Even more convincing, however, is the fact that before owning the golf course property, Liberty promoted the sale of Ranch View Estates, property that it owns which abuts the same golf course. Liberty did this by referencing the proximity and existence of the golf course. In its advertisements distributed to potential purchasers, Liberty specifically mapped out the lots available and made reference to where the golf course was located. The advertisements for Ranch View Estates specifically state: "Skyline Woods Golf Course is just across the section," and the advertisements for Ranch View Estates II state: "All the lots are walkouts. Backing up to Skyline Woods Golf Course."
Liberty not only used the proximity of the golf course in the written advertisements, but David Broekemeier also told prospective purchasers about the benefits of the golf course location. A prospective buyer testified that she contacted David Broekemeier in 2002 about purchasing a lot to build a home in Ranch View Estates. She stated that "[David] Broekemeier said that what was really nice about the lots was that the golf course for Skyline Woods was just on the other side, so it was just like being on the golf course."
The Broekemeiers undoubtedly knew that abutting property owners relied on the existence of the golf course and that the residential lots were designed to benefit from the proximity of the golf course. Further, David Broekemeier knew of the recorded restrictions on the homeowners' properties that were designed to protect the use of the golf course. If David Broekemeier had been prudent, he would have inquired further and found that the surrounding homeowners were protected by restrictive covenants connected with *392 the golf course. In fact, Liberty and the Broekemeiers do not actually dispute their knowledge of the possibility of implied covenants under common law.
Our recording statute does not change the analysis. Section 76-238 provides that any instrument that must be recorded, but is not, shall not be enforced against "subsequent purchasers without notice."[35] As we concluded above, Liberty and the Broekemeiers were not purchasers without notice of the restrictions.
We conclude that an implied restrictive covenant existed which would have required that the property be maintained as a golf course, pursuant to items (1) through (7) of the joint stipulation. Furthermore, Liberty and the Broekemeiers had sufficient knowledge of the existence of the implied covenant for it to be enforceable against them. We next consider Liberty and the Broekemeiers' primary contention that any enforceable implied covenants that may have existed were extinguished in the bankruptcy sale.

3. BANKRUPTCY SALE
Liberty and the Broekemeiers allege that even if they would have otherwise been bound by implied restrictive covenants to maintain the property as a golf course, the bankruptcy court's order selling the property to Liberty free and clear of any interest under 11 U.S.C. § 363(f) (2000) extinguished any covenants running with the land. Homeowners argue that the bankruptcy court's order never purported to extinguish the restrictive covenants in question in this case. In any event, Homeowners argue that the bankruptcy court lacked jurisdiction to do so. We conclude that the bankruptcy sale has no effect on implied restrictive covenants and that as such, Liberty and the Broekemeiers are still bound by them.
A trustee can only sell property of an estate free and clear of "any interest" under one of the five circumstances listed in 11 U.S.C. § 363(f):
(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2) such entity consents;
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4) such interest is in bona fide dispute; or
(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.
"Any interest" is not defined by the bankruptcy code. However, case law demonstrates that the bankruptcy order authorizing the sale to Liberty did not extinguish the implied restrictive covenants limiting the property to the use as a golf course, because such interests are not within the meaning of "any interest" under § 363(f). The courts addressing whether a bankruptcy trustee may sell property of an estate free and clear of restrictive covenants under § 363(f) have all concluded that such a sale is not permitted.[36]
*393 For example, the court in In re Oyster Bay Cove, Ltd.[37] concluded that the language of § 363(f) does not include "non-monetary restrictions of record which run with the land."[38] And, in Gouveia v. Tazbir,[39] the court reasoned under Indiana law that because covenants running with land are interests in property, rather than executory contracts which can be rejected, 11 U.S.C. § 365 (2000) of the bankruptcy code does not apply to them. Further, restrictive covenants create equitable interests that do not compel a person to accept a monetary interest; thus, when restrictive covenants are involved, there is nothing that can force those who benefit from restrictive covenants to "forego [sic] equitable relief in favor of a cash award."[40] In In re Rivera,[41] the court concluded that covenants running with the land are property interests that cannot be removed in a discharge because to do so would be taking a property interest away from a third party and giving the debtor a property interest which the debtor never had.
The Restatement (Third) of Property[42] states: "No servitude, other than a covenant to pay money that is not imposed as part of a general plan of development, conservation servitude, or easement arrangement, is extinguishable in a bankruptcy proceeding, unless otherwise required by statute." We agree with the district court that the bankruptcy court's order did not extinguish the implied restrictive covenants.
As such, Homeowners' suit regarding the existence of implied restrictive covenants is not a collateral attack on the bankruptcy order. A collateral attack is where a judgment is attacked in a way other than a proceeding in the original action to have it vacated, reversed, or modified or a proceeding in equity to prevent its enforcement.[43] Homeowners do not seek to vacate, reverse, modify, or prevent the enforcement of the bankruptcy order. Therefore, Homeowners are not collaterally attacking the bankruptcy order.

4. CROSS-APPEAL: SCOPE OF ORDER
The district court ordered that the property be maintained as a golf course and then set forth certain maintenance requirements. Other than contesting the enforceability of the underlying covenants, Liberty and the Broekemeiers do not assert that particulars of this order were outside the scope of the covenants. In their cross-appeal, Homeowners assert that the court should have ordered not just that the property be maintained as a golf course, but that the court should have also compelled Liberty to reopen and operate it as such, or sell it to an entity capable of doing so. Considering the restrictive covenants at the time the homeowners purchased their lots, we believe they relied on the atmosphere and beauty that living near a golf course provides, and they have a right, enforceable against Liberty, to abut grounds maintained at least to the same standard as set out in the joint stipulation. However, we are unconvinced that the implied covenant is so broad that it *394 entails an obligation to operate the golf course. We find no merit to Homeowners' allegation that the district court's order inadequately protected their rights under the implied covenant.

5. CROSS-APPEAL: NUISANCE
As to Homeowners' contention that Liberty's actions constitute a nuisance, we confine ourselves to their argument in their brief: "The Defendants' failure to operate the course or properly maintain the property interferes with the ability of the homeowners in Skyline Woods and other subdivisions near the golf course to enjoy their property."[44] "`"A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land."'"[45] In an equity action, "the invasion of or interference with another's private use and enjoyment of land need only be substantial."[46] Our court recognizes the principles set forth in Restatement (Second) of Torts[47] regarding nuisance.[48] Specifically, our court recognizes that § 822 provides a description of conduct that provides a basis for nuisance liability.[49] Such section states:
One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
(a) intentional and unreasonable, or
(b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.[50]
Homeowners' brief fails to set forth the sufficient facts that would warrant a finding of nuisance. Instead, Homeowners' argument that the district court erred in failing to find Liberty and the Broekemeiers liable for nuisance is merely a restatement of their claim that implied restrictive covenants exist on the property requiring that the golf course be properly maintained. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party assigning the error.[51] As such, we find no merit to Homeowners' cross-appeal that the district court erred in denying a separate claim for nuisance.

6. BROEKEMEIERS' PERSONAL LIABILITY
Finally, we address the Broekemeiers' argument that judgment should not have been entered against them, as they are not proper parties to the claim asserted against them for violation of protective covenants. The record does not reveal any evidence that this issue was ever presented to the trial court. An appellate court will not consider an issue on appeal that was not presented to or passed upon *395 by the trial court.[52] As such, we find no merit to this assignment of error.

VI. CONCLUSION
As to Homeowners, case No. S-07-952, for the foregoing reasons, we affirm the order of the district court that the implied covenants require that the property is to be used only as a golf course. As to maintenance, the golf course shall be maintained according to standards (1) through (7) of the June 13, 2006, joint stipulation of the parties. Accordingly, we modify the district court's order regarding the required standards of maintenance.
As to Paisley, case No. S-07-953, we dismiss the appeal for lack of jurisdiction.
JUDGMENT IN NO. S-07-952 AFFIRMED AS MODIFIED. APPEAL IN NO. S-07-953 DISMISSED.
NOTES
[1] Smith v. City of Papillion, 270 Neb. 607, 705 N.W.2d 584 (2005).
[2] In re Estate of Potthoff, 273 Neb. 828, 733 N.W.2d 860 (2007).
[3] Cerny v. Todco Barricade Co., 273 Neb. 800, 733 N.W.2d 877 (2007).
[4] 9 Richard R. Powell & Michael Allan Wolf, Powell on Real Property § 60.03[1] (2000); 20 Am.Jur.2d Covenants, Conditions, and Restrictions § 155 (2005).
[5] McCurdy v. Standard Realty Corporation, 295 Ky. 587, 588, 175 S.W.2d 28, 29 (1943). See 20 Am.Jur.2d, supra note 4.
[6] Roper v. Camuso, 376 Md. 240, 829 A.2d 589 (2003); Annot., 119 A.L.R.5th 519 (2004).
[7] Roper v. Camuso, supra note 6.
[8] Id. at 261, 829 A.2d at 602.
[9] 9 Powell & Wolf, supra note 4.
[10] Id.
[11] Wessel v. Hillsdale Estates, Inc., 200 Neb. 792, 266 N.W.2d 62 (1978).
[12] Id. at 797, 266 N.W.2d at 66.
[13] Id. at 801, 266 N.W.2d at 68.
[14] Wessel v. Hillsdale Estates, Inc., supra note 11.
[15] Id. at 801, 266 N.W.2d at 68 (quoting Lund v. Orr, 181 Neb. 361, 148 N.W.2d 309 (1967)).
[16] See, e.g., Shalimar Ass'n v. D.O.C. Enterprises, Ltd., 142 Ariz. 36, 688 P.2d 682 (Ariz. App.1984), Compare, Warren v. Detlefsen, 281 Ark. 196, 663 S.W.2d 710 (1984); Mackinder v. OSCA Development Co., 151 Cal.App.3d 728, 198 Cal.Rptr. 864 (1984); Grange v. Korff, 248 Iowa 118, 79 N.W.2d 743 (1956); Arthur v. Lake Tansi Village, Inc., 590 S.W.2d 923 (Tenn.1979).
[17] Shalimar Ass'n v. D.O.C. Enterprises, Ltd., supra note 16.
[18] Id.
[19] Id.
[20] Id.
[21] Id.
[22] Id.
[23] Id.
[24] Ute Park Summer Homes Ass'n v. Maxwell Land Gr. Co., 77 N.M. 730, 427 P.2d 249 (1967).
[25] Id.
[26] Id.
[27] Id.
[28] Id.
[29] Id. at 735, 427 P.2d at 253 (citing People v. Reed, 81 Cal. 70, 22 P. 474 (1889); East Atlanta Land Co. v. Mower, 138 Ga. 380, 75 S.E. 418 (1912); Mann v. Bergmann, 203 Ill. 406, 67 N.E. 814 (1903); Will v. City of Zion, 225 Ill.App. 179 (1922); Fisher v. Beard, 32 Iowa 346 (1871); Lord v. Atkins et al., 138 N.Y. 184, 33 N.E. 1035 (1893); Matter of City of New York (Edgewater Road), 138 A.D. 203, 122 N.Y.S. 931 (1910); Green v. Miller, 161 N.C. 24, 76 S.E. 505 (1912)).
[30] Ute Park Summer Homes Ass'n v. Maxwell Land Gr. Co., supra note 24, 77 N.M. at 735, 427 P.2d at 253.
[31] Neb.Rev.Stat. § 76-238 (Reissue 2003).
[32] Roper v. Camuso, supra note 6; Shalimar Ass'n v. D.O.C. Enterprises, Ltd., supra note 16.
[33] Shonsey v. Clayton, 107 Neb. 695, 701, 187 N.W. 113, 115 (1922) (citing Bourland v. The County of Peoria et al., 16 Ill. 538 (1855)).
[34] See Shonsey v. Clayton, supra note 33. See, also, McParland v. Peters, 87 Neb. 829, 128 N.W. 523 (1910); Barney v. Chamberlain, 85 Neb. 785, 124 N.W. 482 (1910); Galland v. Jackman, 26 Cal. 79 (1864); Cooper v. Flesner et al., 24 Okla. 47, 103 P. 1016 (1909).
[35] See Caruso v. Parkos, 262 Neb. 961, 637 N.W.2d 351 (2002).
[36] See, Gouveia v. Tazbir, 37 F.3d 295 (7th Cir.1994); In re WBQ Partnership, 189 B.R. 97 (Bankr.E.D.Va.1995); In re Oyster Bay Cove, Ltd., 161 B.R. 338 (Bankr.E.D.N.Y. 1993); In re 523 E. Fifth St. Housing Pres. Dev. Fund, 79 B.R. 568 (Bankr.S.D.N.Y.1987). See, also, Basil H. Mattingly, Sale of Property of the Estate Free and Clear of Restrictions and Covenants in Bankruptcy, 4 Am. Bankr. Inst. L. Rev. 431 (1996).
[37] In re Oyster Bay Cove, Ltd., supra note 36.
[38] Id. at 343. See, also, Gouveia v. Tazbir, supra note 36; In re 523 E. Fifth St. Housing Pres. Dev. Fund, supra note 36.
[39] Gouveia v. Tazbir, supra note 36.
[40] Id. at 299.
[41] In re Rivera, 256 B.R. 828 (Bankr.M.D.Fla. 2000).
[42] Restatement (Third) of Property: Servitudes § 7.9 at 388 (2000).
[43] Mayfield v. Hartmann, 221 Neb. 122, 375 N.W.2d 146 (1985).
[44] Brief for appellees on cross-appeal in case No. S-07-952 at 47.
[45] Johnson v. Knox Cty., Partnership, 273 Neb. 123, 131, 728 N.W.2d 101, 108 (2007) (quoting Hall v. Phillips, 231 Neb. 269, 436 N.W.2d 139 (1989), quoting Restatement (Second) of Torts § 821D (1979)).
[46] Hall v. Phillips, supra note 45, 231 Neb. at 278, 436 N.W.2d at 145.
[47] Restatement (Second) of Torts § 822 (1979).
[48] Hall v. Phillips, supra note 45.
[49] Id.
[50] Restatement (Second) of Torts, supra note 47 at 108.
[51] Bellino v. McGrath North, 274 Neb. 130, 738 N.W.2d 434 (2007); Betterman v. State, Department of Motor Vehicles, 273 Neb. 178, 728 N.W.2d 570 (2007).
[52] Kubicek v. City of Lincoln, 265 Neb. 521, 658 N.W.2d 291 (2003).